**AFFIRM; and Opinion Filed August 16, 2019.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-18-00188-CV

**GLOBAL SUPPLY CHAIN SOLUTIONS, LLC, Appellant**
**V.**
**RIVERWOOD SOLUTIONS, INC. AND LORI AUSTIN, Appellees**

**On Appeal from the 416th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 416-04054-2015**

# MEMORANDUM OPINION

Before Justices Schenck, Osborne, and Reichek
Opinion by Justice Osborne

After merger talks between appellant Global Supply Chain Solutions, LLC and appellee Riverwood Solutions, Inc. fell through, Global Supply sued Riverwood alleging claims including breach of contract, misappropriation of trade secrets, and tortious interference with contract. Global Supply also sought injunctive relief against appellee Lori Austin. The trial court granted summary judgment for Riverwood and Austin. In nine issues, Global Supply alleges the trial court erred by granting summary judgment, striking its expert witnesses, and granting Austin her attorney's fees. For the reasons we discuss, we affirm the trial court's judgment.

## BACKGROUND

Global Supply and Riverwood are competitors in the supply chain management industry. In its petition, Global Supply described the industry as "the business of helping companies manage

both their relationships with suppliers and inventory on their behalf." At the time of their merger discussions in 2014, their business models were different. Global Supply's president, Philip Odette, explained that Global Supply purchased and sold component parts to its customers and also provided services to customers for a monthly service fee. One of the services Global Supply provided was implementing a product data management ("PDM") solution, using a centralized software system to store all of the information related to a customer's product.

Riverwood, in turn, was "exclusively a pay-for-services business," according to its then-CEO Ronald C. Keith. Riverwood had a consulting business and a managed service business, charging clients a fee for each service. Keith contrasted Riverwood's business with Global Supply's: "And so [Global Supply] was a product or what people in the industry would call a buy/sell business, and ours was purely a services business." But like Global Supply, Riverwood offered PDM services. Keith explained that Riverwood began offering PDM services in 2008:

> It was always a business that was accidentally pretty good. You know, the people that are normally our customers are the small to midsize companies that probably have not really thought about what they need to manage this thing as they get bigger, and so we would help them with various things, and we'd say, you know, your data is kind of a mess. There are a number of off-the-shelf programs. Maybe you should look at, you know, implementing one of them. Quite often they would say, you know, we don't have the time or the resources. And we would say, you know, that is something that, you know, we can do for you if you'd like.

Austin came to work at Global Supply in 2010 as an independent contractor on a specific project. That year, the company had undergone a change in both ownership and management. Leon Backes became the owner of the company, and Paul Peck became its president. Peck knew Austin and recommended her to Global Supply. Under a written agreement dated January 4, 2011 (the "Austin Agreement"), Global Supply "retain[ed] [Austin] as an independent contractor to perform consulting services for the Company." Two provisions of the Austin Agreement are at issue in this lawsuit:

- Paragraph 2(b), providing that Austin "will not, during or subsequent to the term of this Agreement, use the Company's Confidential Information for any purpose whatsoever other than the performance of the Services on behalf of the Company or disclose the Company's Confidential Information to any third party," and

- Paragraph 8, "Independent Contractor," stating the parties' "express intention" that Austin "is an independent contractor." "Nothing in this Agreement shall in any way be construed to constitute the Consultant as an agent, employee or representative of the Company, but the Consultant shall perform the Services hereunder as an independent contractor. . . ."

Peck implemented a proprietary PDM service for Global Supply and trained Austin in using it. Peck left Global Supply in 2012, and Odette succeeded him as Global Supply's president.

In 2014, Global Supply began sourcing building supplies for another of Backes's companies, Provident Realty Advisers, Inc. ("PRA"), a property development firm. Global Supply's principals formed an entity called Integris, described by Odette as "a building supply company that sells lighting, plumbing, flooring, hardware and other material to multi-family, hospitality, and other building construction entities," to undertake this work.

In early 2014, Keith approached Backes at PRA. In a February 20, 2014 email, Keith introduced himself as Riverwood's CEO. He asked Backes if they might discuss Backes's plans for Global Supply to see "if there might be some kind of synergies between our two firms." Backes replied that he had "certainly heard of Riverwood" and "would be happy to chat." Backes referred Keith to Odette, and on March 25, 2014, Keith and Odette signed an agreement (the "Letter Agreement") to facilitate their discussions. Three Letter Agreement provisions are at issue here:

- Riverwood's promise in paragraph 2 to use "Evaluation Material" (broadly defined as "all information, in whatever form or medium, disclosed or provided to you") "solely for the purpose of evaluating a possible Transaction" between the companies;

- Riverwood's promise in paragraph 9(a) not to "solicit for employment or consulting services, employ, or otherwise contract for the services of any employee of" Global Supply; and

- Riverwood's promise in paragraph 9(b) not to "interfere with or otherwise disrupt the business relations between [Global Supply] and any of its current or prospective

–3–

customers or suppliers" "as a result of knowledge or information obtained from the Evaluation Material or in connection with a possible Transaction."

After Odette and Keith signed the Letter Agreement on behalf of Global Supply and Riverwood, respectively, Global Supply provided Riverwood with a seven-page Power Point presentation containing financial information about Global Supply. Global Supply did not provide any other written material to Riverwood. Odette and Keith soon abandoned their discussions. No merger occurred.

Three subsequent events gave rise to this lawsuit:

**1. September 15, 2014 solicitation of Global Supply customer PRA**

On September 15, 2014, Tom David of Riverwood contacted Backes by email. David wrote:

> . . . Wanted to let you know that Riverwood Solutions has begun sourcing building materials at the request of one of our larger clients.
>
> We have successfully sourced:
>
>> interior and exterior lighting products (including parking lot lighting)
>> kitchen and bath plumbing fixtures
>> sinks
>> doors
>> lumber
>
> Although the savings by product family may vary, the cumulative average landed costs of all of these products is 35% less than current client reported costs.
>
> Sourcing of other commodities is underway and more to come soon.
>
> We are very interested in expanding our offering to a select group of property development firms. If you are interested in exploring this opportunity further, please let me know a good time to call. . . .

Backes did not respond to the email. PRA did not do any business with Riverwood.

**2. March 24, 2015 second solicitation of Global Supply customer PRA**

Riverwood again contacted Backes about Riverwood's building supply sourcing business.

In an email dated March 24, 2015, Keith wrote:

Leon,

My team at Riverwood Solutions has been spending a lot of time sourcing building materials over the last 6 or 7 months.

Based on the work our team has done on some 300+ different items looking across sources in China, Vietnam and Thailand, one of the larger multi-family developers in the US and some friends of our firm have started a company specifically to address off-shore sourcing of building material as well as other supply chain and logistics related issues related to multi-family projects. They threw in a very significant amount of start-up capital.

I know that you had [Global Supply] doing some of this work for you 9 or 10 months ago specifically to help you out at Provident. Perhaps this is something that we should chat about. We've got 11 people in 4 countries working on this initiative full time. Some of the numbers are pretty attention getting.

Let me know if you like [sic] to discuss this and see if there is some play here for either Provident or [Global Supply].

Best regards,
Ron Keith

Again, there is no evidence of any response from Backes or PRA.

### 3. Austin's resignation from Global Supply to begin employment at Riverwood

In a summary judgment affidavit, Austin testified that on July 16, 2015, she received a call from Frank McConahey, a former Global Supply project manager who was then working at Riverwood. McConahey asked if Austin would be interested in coming to Riverwood "to grow its product data management consulting business." Austin met with David and accepted an offer to become Riverwood's director of PDM services. As required under the Austin Agreement, Austin gave Global Supply written notice of her resignation on August 19, 2015, stating that her last day at Global Supply would be September 9, 2015.

Upon receiving Austin's notice letter, Odette contacted Keith, reminding him of "the non-solicitation we had in place" and stating that Austin's hiring was a violation of it. In a follow-up conversation, Keith told Odette that Riverwood had discussed the matter with counsel and was

going to proceed with hiring Austin. Keith testified that in the follow-up call, he apologized for not recalling that the Letter Agreement was still in effect. But he continued:

> Having said that, the contract has no validity over what we're doing here. We're hiring someone who is not an employee of yours, and the contract between our firms says that I can't hire your employees, and so I'm not doing that. [Odette] said something to the effect that although she's not an employee, we've always considered her one. I said: I don't know what to do with that information, Phil. You know, the contract says we can't hire your employees and we're not. At the same time, I've made an offer to someone. I think rescinding it puts me in a very precarious position, and so I'm unwilling to do that.

Global Supply brought this suit against Riverwood and Austin on September 30, 2015, asserting claims for breach of contract, violations of the Texas Uniform Trade Secrets Act, tortious interference with existing contract, and "aiding, abetting, assisting and encouraging" against Riverwood and pleading for injunctive relief against Austin. Global Supply alleged that its "rights are threatened with irreparable injury by the loss of its Vice President of Operations, who has detailed knowledge of Plaintiff's confidential proprietary information and trade secrets, to a direct competitor that has engaged in a repeated pattern of attempting to steal customers, employees, and such proprietary trade secrets." Austin filed a counterclaim against Global Supply, requesting a declaration that "she has not breached the Austin Agreement and that her employment by Riverwood does not violate any statute or contract."

Global Supply never attempted to establish its right to injunctive relief by setting the matter for hearing or offering evidence of the irreparable injury it claimed. The Letter Agreement's three-year term expired in March 2017, but the Austin Agreement's nondisclosure provisions continued "subsequent to the term of this Agreement."

The parties proceeded with discovery and entered into an agreed scheduling order that included provisions about designating experts. The parties submitted the order to the trial court, and the trial court signed it on May 15, 2017. Regarding experts, the parties agreed:

6. **Designations of experts:** the party seeking affirmative relief on an issue shall provide a designation of its testifying experts by August 31, 2017; the party not seeking affirmative relief on an issue shall provide a designation of its testifying experts by September 29, 2017

7. Other terms: Expert reports must be served with designations

Global Supply designated three expert witnesses by the agreed deadline, but did not provide reports for any of them. On the date for designating rebuttal experts, Global Supply designated Peck and provided a report. On Riverwood's and Austin's motions, the trial court struck these designations.

In November 2017, Riverwood moved for summary judgment on Global Supply's claims. Austin filed a separate motion for summary judgment on her request for declaratory relief. Global Supply filed a motion for partial summary judgment on its claim for breach of contract on the ground that Austin was either its "employee" or its "supplier" as a matter of law, so that Riverwood breached paragraph 9(a) or paragraph 9(b) of the Letter Agreement as a matter of law. The trial court granted Riverwood's and Austin's motions and denied Global Supply's.

This appeal followed.

## DISCUSSION

## I. Standards of Review

We review a trial court's summary judgment de novo. *Dallas Nat'l Ins. Co. v. Calitex Corp.*, 458 S.W.3d 210, 221 (Tex. App.—Dallas 2015, no pet.). The movant for a traditional summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex. 1985). Evidence favorable to the non-movant is taken as true, and every reasonable inference is indulged in the non-movant's favor. *Id.* at 548–49. When both parties have moved for summary judgment and the trial court has granted one party's motion and denied the other, we review the summary judgment evidence presented by both sides and determine all questions

presented. *Calitex Corp.*, 458 S.W.3d at 221. If we conclude the trial court committed reversible error, we render the judgment the trial court should have rendered. *Id.*

We review a trial court's enforcement of a scheduling order for an abuse of discretion. *Esty v. Beal Bank, S.S.B.*, 298 S.W.3d 280, 295–96 (Tex. App.—Dallas 2009, no pet.). We also review the trial court's determination regarding the admission of expert testimony for abuse of discretion. *Transcontinental Realty Investors, Inc. v. Wicks*, 442 S.W.3d 676, 680–81 (Tex. App.—Dallas 2014, pet. denied). A trial court abuses its discretion if it acts without reference to guiding rules and principles. *Gunn v. McCoy*, 554 S.W.3d 645, 666 (Tex. 2018). "To reverse a trial court's judgment based on the exclusion of evidence, we must find that the trial court did in fact commit error, and that the error was harmful." *Id.* We may reverse the trial court's judgment only if the erroneous exclusion of evidence probably caused the rendition of an improper judgment, *id.* at 668, or "probably prevented the appellant from properly presenting the case to the court of appeals." TEX. R. APP. P. 44.1(a).

## II. Common Questions

There are two questions common to several of Global Supply's issues. First, Global Supply contends that Austin was its "employee" or its "supplier" for purposes of sections 9(a) and 9(b) of the Letter Agreement. All of the summary judgment motions filed by Global Supply, Austin, and Riverwood included this issue. Second, Global Supply argues that Austin's "inevitable disclosure" of its confidential, proprietary, or trade secret information is sufficient to raise a fact issue on the injury and damages it claims to have suffered on its claims for breach of contract, violations of the Texas Trade Secrets Act, tortious interference, and "assisting and encouraging" against Riverwood, and to preclude summary judgment on Austin's declaratory judgment request.

**A.**     **Was Austin Global Supply's (a) employee, (b) independent contractor, or (c) supplier?**

Global Supply contends that Riverwood's solicitation of Austin was a breach of two provisions in the Letter Agreement: (1) Riverwood's agreement in Section 9(a) not to solicit Global Supply's employees for employment, and (2) Riverwood's agreement in Section 9(b) not to interfere with or disrupt the business relations between Global Supply and its suppliers. Riverwood and Austin respond that because Austin was neither an "employee" nor a "supplier," there was no breach of the Letter Agreement as a matter of law.

To support their argument, Riverwood and Austin rely on paragraph 8 of the Austin Agreement. In paragraph 8, Global Supply and Austin stated their "express intention" that Austin "is an independent contractor." Paragraph 8 forbids construction of the agreement "to constitute [Austin] as an agent, employee or representative of [Global Supply]." The preamble to the Austin Agreement states that Global Supply "desires to retain the Consultant [previously identified as Austin] as an independent contractor to perform consulting services." And paragraph 9 of the Austin Agreement provides that Austin "acknowledges and agrees and it is the intent of the parties hereto that Consultant receive no Company-sponsored benefits from the Company either as a Consultant or employee."

Global Supply does not point to any conflicting or ambiguous provision. The construction of an unambiguous contract is a question of law. *URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 763 (Tex. 2018). The Austin Agreement unambiguously provides that Austin is an independent contractor.

In support of their own motions for summary judgment, Riverwood and Austin also offered evidence that Global Supply always paid Austin by the hour, did not withhold income or payroll taxes from her pay, issued her IRS 1099 forms, did not provide paid vacation, sick leave, or health savings account contributions, and never paid her an annual salary. Austin did not execute an

employment agreement with Global Supply and was not required to sign the employee handbook. Even after Austin was given the title of "VP Director of Operations" in January 2015, Global Supply continued to pay her by the hour pursuant to the Austin Agreement until her resignation later the same year. Riverwood also relied on a letter written in January 2015 by Terry Gonzalez in her capacity as Global Supply's vice president of finance describing Austin as a "contractor" who "has supplied consulting services on a consistent basis since 2011." "A contract expressly providing that a person is an independent contractor is determinative of the relationship absent evidence that the contract is a mere sham or subterfuge designed to conceal the true legal status of the parties or that the contract has been modified by a subsequent agreement between the parties." *Poynor v. BMW of N. Am., LLC*, 441 S.W.3d 315, 319–20 (Tex. App.—Dallas 2013, no pet.).

Global Supply contends, however, that it offered "conclusive evidence" that Austin was its employee, regardless of the Austin Agreement's unambiguous provisions or the evidence supporting Global Supply's treatment of Austin as an independent contractor. Global Supply argues that its claim is for breach of the Letter Agreement, the Letter Agreement is separate from the Austin Agreement, and the Letter Agreement does not define "employee," so we must apply the common law "control" test for determining whether a worker qualifies as an employee rather than as an independent contractor. Global Supply then cites cases addressing an employer's vicarious liability for the acts of its employee or contractor and an employer's liability for worker's compensation benefits. *See, e.g.*, *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 542–43 (Tex. 2002) (considering whether medical residency program was vicariously liable for medical resident's negligent treatment of patient).

In support of its contention that it controlled Austin's work, Global Supply offered evidence that when Austin joined Global Supply and at the time she signed the Austin Agreement, Global Supply's then-CEO assigned her specific tasks and oversaw all of her work. Further, Global

Supply provided Austin with all of the "tools and instrumentalities" she needed for her work, "including a computer, desk phone, software licenses, servers, and the hardware and software she needed," as well as a cubicle, and later an office. Even though the Austin Agreement provided that Global Supply could be reimbursed for these tools and instrumentalities, Global Supply never asked Austin for reimbursement. Austin worked full time at Global Supply, did not report working for anyone else, and later in her tenure, was given the title of Vice President of Operations.

Global Supply's evidence may be relevant for determining its vicarious liability to a third-party plaintiff for Austin's negligence, but there is no such claim in this case. Global Supply does not cite any authority to support its contention that the evidence raises a fact issue on its claim that regardless of its express agreement to the contrary in the Austin Agreement, Austin was an "employee" for purposes of the Letter Agreement.

Global Supply also argues that Riverwood cannot rely on the Austin Agreement to establish that Austin was not an employee because Riverwood was not a party to the Austin Agreement. But Austin, who is a party to the Austin Agreement, sought and obtained a declaration that her employment by Riverwood did not violate any contract. She relied on the Austin Agreement to support her contention that her hiring did not violate the Letter Agreement's provision prohibiting Riverwood from hiring a Global Supply "employee." To grant Austin's motion for summary judgment, the trial court construed the Austin Agreement as a matter of law to determine that Austin was not an employee. Further, Global Supply relies on Austin's promise in the Austin Agreement not to disclose confidential information to establish its claims against Riverwood for misappropriation of trade secrets by hiring Austin. Global Supply may not rely on the Austin Agreement for some of its claims against Riverwood and disavow it for others. *See, e.g., Trinity Universal Ins. Co. v. Bill Cox Constr., Inc.*, 75 S.W.3d 6, 10-11 (Tex. App.—San Antonio 2001,

–11–

no pet.) (party cannot accept beneficial portions of contract and deny application of detrimental or disadvantageous provisions).

Global Supply also argues that if Austin was not an "employee" under section 9(a) of the Letter Agreement, then she was a "supplier" under section 9(b), "because it is undisputed that she supplied services to Global Supply." Global Supply argues that Riverwood learned about Austin's "key role" at Global Supply from the merger discussions when Odette and Keith discussed "key personnel." Global Supply argues that the information that Austin was considered "key personnel" fell within the Letter Agreement's definition of "Evaluation Material." Consequently, Global Supply concludes that Riverwood breached section 9(b)'s prohibition against interfering or otherwise disrupting Global Supply's business relations with its suppliers "as a result of knowledge or information obtained from the Evaluation Material or in connection with a possible Transaction."

Riverwood counters that both the Austin Agreement and the Letter Agreement distinguish between "suppliers" on one hand and independent contractors and consultants on the other. The Austin Agreement refers to Austin only as an independent contractor or a consultant. It uses the word "supplier" only once, describing "information regarding . . . suppliers and customers" as a type of proprietary information that Austin must keep confidential. Under the Letter Agreement, Riverwood agreed not to employ Global Supply's employees and not to solicit them "for . . . consulting services . . . or otherwise contract for" their services. The prohibition against interfering with business relations between Global Supply "and any of its current or prospective customers or suppliers" is a separate provision that does not refer to contractors or consultants. When interpreting a contract, we "examine and consider the entire writing in an effort to harmonize and give effect to all the provisions in the contract so that none will be rendered meaningless." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). Both contracts distinguish between suppliers and

independent contractors and include provisions specific to each. We conclude that under the express terms of the contracts, Austin was not a "supplier" for purposes of section 9(b).

**B.     May Global Supply rely on the "inevitable disclosure" doctrine as summary judgment proof of injury and damages?**

Although there is no direct evidence that Austin disclosed any trade secret or confidential information to Riverwood, Global Supply argues that it is "inevitable" that Austin has or will unlawfully disclose its trade secrets in the course of her employment at Riverwood. Global Supply relies on Austin's inevitable disclosure of its trade secrets and other confidential or proprietary information, without more, to raise a fact issue on the injury or damages element of its claims. Global Supply relies on *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995), in which the court explained that "a plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets."[1] The court in *Redmond* explained that "the ITSA [Illinois Trade Secrets Act] plainly permits a court to enjoin the threat of misappropriation of trade secrets," but "there is little law in Illinois or in this circuit establishing what constitutes threatened or inevitable misappropriation." *Id.* at 1268. The question resolved by the court in *Redmond* was whether PepsiCo had demonstrated irreparable injury for purposes of obtaining a preliminary injunction. *See id.* at 1271.

Similarly, in *Cardinal Health Staffing Network, Inc. v. Bowen*, 106 S.W.3d 230, 241–42 (Tex. App.—Houston [1st Dist.] 2003, no pet.), the court discussed Cardinal's argument that "the 'inevitable disclosure' doctrine effectively relieved Cardinal of having to show irreparable injury for which it had no adequate legal remedy" in order to obtain a temporary injunction. The court explained, "[w]e have found no Texas case expressly adopting the inevitable disclosure doctrine,

---

[1] Global Supply also cites *Molon Motor & Coil Corp. v. Nidec Motor Corp.*, No. 16 C 03545, 2017 WL 1954531, at *5 (N.D. Ill. May 11, 2017), for the same proposition. In that case, the court applied the inevitable disclosure doctrine in reaching its conclusion that the plaintiff had "state[d] a claim to relief that is plausible on its face" for purposes of a motion to dismiss under federal rule of civil procedure 12(b)(6). *Id.* at *2, 5–7.

and it is unclear to what extent Texas courts might adopt it or might view it as relieving an injunction applicant of showing irreparable injury." *Id.*[2]

Texas adopted the Uniform Trade Secrets Act in 2013. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 134A.001–.008 ("TUTSA"). With limited exceptions, TUTSA "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret," although it "does not affect . . . contractual remedies." *Id.* § 134A.007(a), (b)(1). TUTSA does not include a provision regarding "inevitable disclosure," but does permit the issuance of injunctive relief in connection with "threatened misappropriation" of trade secrets. TUTSA § 134A.003.[3] Global Supply argues that "[b]y adopting TUTSA, the Texas Legislature has brought the [inevitable disclosure] doctrine to Texas, to the extent it was not here already."

Here, however, Global Supply argues that the inevitable disclosure doctrine applies to provide evidence raising a fact issue on damages. Global Supply pleaded for an injunction against Austin but never set the matter for hearing or offered evidence to establish its right to injunctive relief; consequently, it now seeks only damages from Riverwood. Global Supply argues that applying the inevitable disclosure doctrine to provide proof of damages is "far less consequential" than applying it "in the injunction context":

> After all, the extraordinary remedy of an injunction is a more drastic interference with a defendant's operations than a claim for damages, which does not interfere with a former worker's employment prospects or a competitors' operations in the way an injunction can. It simply seeks compensation for the value of trade secrets that are taken.

---

[2] The *Bowen* court cited this Court's unpublished opinion in *Conley v. DSC Communications Corp.*, No. 05-98-01051-CV, 1999 WL 89955, at *3 (Tex. App.—Dallas Feb. 24, 1999, no pet.) (not designated for publication), as "adopting [a] test with similar attributes" to the inevitable disclosure doctrine. *See Bowen*, 106 S.W.3d at 242. Our opinion in *Conley* pre-dates Texas's adoption of the Uniform Trade Secrets Act, and in any event, like all other cases discussing the inevitable disclosure doctrine, is limited to the question of whether a plaintiff showed "a probable injury during the pendency of the trial unless the injunction issues." *Conley*, 1999 WL 89955, at *2; *see also DGM Servs., Inc. v. Figueroa*, No. 01-16-00186-CV, 2016 WL 7473947, at *5 (Tex. App.—Houston [1st Dist.] Dec. 29, 2016, no pet.) (mem. op.) (discussing *Conley* and concluding that trial court "was not required by the inevitable disclosure doctrine to relieve DGM of its burden to prove a probable, imminent, and irreparable injury").

[3] TUTSA also provides, however, that an injunction order may "not prohibit a person from using general knowledge, skill, and experience that person acquired during employment." TUTSA § 134A.003(a).

But in *HMS Holdings Corp. v. Pub. Consulting Grp., Inc.*, No. 05-15-00925-CV, 2016 WL 1179436, at *2 (Tex. App.—Dallas Mar. 28, 2016, no pet.) (mem. op.), we explained that when a trial court hears an application for temporary injunction in a trade secret misappropriation case, the "ultimate merits" are not at issue:

> Importantly, in determining whether to grant trade secret protection by temporary injunction, a trial court does not determine whether the information sought to be protected is, in fact and in law, a trade secret. *See Mabrey v. SandStream, Inc.*, 124 S.W.3d 302, 311 (Tex. App.—Fort Worth 2003, no pet.). Rather, the trial court determines only whether the applicant has established that the information is entitled to trade secret protection until a trial on the merits. *Id.* The applicant for a temporary injunction is not required to establish that it will prevail upon final trial. *Id.* at 309. The merits of the applicant's suit are not presented for review. *Id.* Findings and conclusions made by the trial court in conjunction with the interlocutory order may be "helpful" in determining whether the trial court exercised its discretion in a reasonable and principled fashion, but they are not binding. *Tom James of Dallas, Inc. v. Cobb*, 109 S.W.3d 877, 884 (Tex. App.—Dallas 2003, no pet.). The ultimate merits of the controversy, both legal and factual issues, are not before the trial court. *See id.* Moreover, we do not assume that the evidence presented at the injunction hearing is the same as the evidence that will be developed at a full trial on the merits. *Id.* at 885. Our decision is expressly limited to whether the trial court's interlocutory order was an abuse of discretion and, like the temporary injunction, has no bearing on the ultimate merits of the case. *Id.* at 890.

*Id.* at *2. Consequently, we conclude that a threatened misappropriation for purposes of a temporary injunction is not a substitute for evidence of the "actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss" to raise a fact issue on damages in response to a motion for summary judgment. TUTSA § 134A.004 (Damages).

Having reached these conclusions, we turn to Global Supply's individual issues.

### III. Global Supply's Issues

**A.**     **Global Supply's breach of contract claim** (Issues 1 and 2)

In its first two issues, Global Supply contends the trial court erred by denying its motion for partial summary judgment and by granting Riverwood's motion for summary judgment on Global Supply's claim for breach of contract. Global Supply alleges that Riverwood breached the

Letter Agreement with respect to two different parts of Global Supply's business: (1) the system it used for sourcing building supplies, and (2) PDM. Global Supply alleges three breaches:

### 1. Alleged breaches

#### a. Use of "Evaluation Material"

Global Supply argues that it disclosed confidential information—specifically, the idea that building supply sourcing can be operated as a standalone business—to Riverwood during their merger discussions. The parties agree that the only written material Global Supply gave Riverwood was the seven-slide Power Point presentation. But Global Supply contends that the parties' principals had discussions in which Odette disclosed the concept to Keith, and Riverwood subsequently initiated its own standalone building supply sourcing business.

Global Supply also argues that it disclosed two other matters to Riverwood as "Evaluation Material": (1) Austin's name in a discussion of "key employees," and (2) that PRA, one of Backes's other companies, was a property development firm that used Global Supply's new building supply sourcing business.

#### b. Soliciting employees

Global Supply alleges that Riverwood hired Austin in violation of its promise in section 9(a) of the Letter Agreement that it would not "solicit for employment or consulting services, employ, or otherwise contract for the services of any [Global Supply] employee." Austin had expertise in PDM, but was not involved in sourcing building supplies.

#### c. Interference with customers or suppliers

Global Supply contends that Riverwood interfered with its customers and suppliers Backes and PRA by its solicitations to Backes. Global Supply also argues that if Austin was not its "employee," she was a "supplier," so that Riverwood violated section 9(b) of the Letter Agreement by hiring her.

## 2. The parties' motions for summary judgment on Global Supply's breach of contract claim

"'A successful breach of contract claim requires proof of the following elements: (1) a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach.'" *Sharifi v. Steen Auto., LLC*, 370 S.W.3d 126, 140 (Tex. App.—Dallas 2012, no pet.) (quoting *Petras v. Criswell,* 248 S.W.3d 471, 477 (Tex. App.—Dallas 2008, no pet.)).

Global Supply moved for partial summary judgment on the ground that Riverwood's solicitation of Austin breached section 9 of the Letter Agreement because Austin was either an employee or a supplier. We have addressed this argument above, and we conclude that Global Supply did not demonstrate its right to judgment on this issue as a matter of law. Consequently, we conclude that the trial court did not err by denying Global Supply's motion for partial summary judgment.

Similarly, Riverwood sought summary judgment on the ground it did not violate section 9 of the Letter Agreement because Austin was not Global Supply's employee or supplier. Riverwood offered the additional summary judgment evidence we have detailed above to support its contention that Austin was an independent contractor. For the reasons stated above, we conclude that Riverwood met its burden to establish its right to judgment on this issue.

Riverwood also sought summary judgment on the ground that there is no evidence "that any alleged breach [of the Letter Agreement] caused Plaintiff an injury for which the law allows a recovery of damages." Global Supply responded that it had competent evidence of damages, including lost profits. In his deposition, Odette confirmed Global Supply's discovery response that $1,015,197 "is the minimum cost [Riverwood] would have [in]curred in human resources and research development costs to create on its own a competitive building supply system, and process of the nature and type that it has received via its misappropriation of Global Supply's building

–17–

supplies system." He also confirmed that the calculation was "based on the actual cost of the same expended and incurred by Global Supply in creating its proprietary trade secret building supply system including salary and compensation paid to Philip Odette, Casee Neal and others." Terry Gonzalez, Global Supply's vice president of finance, testified that she calculated the figure at Odette's direction by looking up and adding together the salaries of the persons Odette designated. Gonzalez explained:

> Q. Okay. So the methodology for coming up with $1,015,197 was Mr. Odette giving you information as to what interns and others, in addition to himself and Casee Neal were involved in the building supply system?
>
> A. Yes.

Gonzalez had no knowledge about how Riverwood operates its building supply system or whether Riverwood's system is the same as Global Supply's. Odette testified that Gonzalez's calculation was "the cost incurred that we had captured in the building supply division up to the point of [Austin's] departure." Although the evidence is undisputed that Riverwood breached section 9(b) by twice contacting Backes, the breach by David took place one year before Austin resigned and the breach by Keith took place six months before Austin resigned, so that Global Supply's damages calculation does not correlate to the dates of the breaches. In any event, it is also undisputed that Backes did not respond to the solicitations.

After hearing Riverwood's motion for summary judgment, the trial court ordered Global Supply to file a supplemental brief "on the issue of whether it has evidence of damages due to an alleged violation of Section 9(b)" of the Letter Agreement, and Riverwood to respond.[4] Global Supply complied with the trial court's order, subject to its objection that "the issue to be briefed was not a stated ground" in Riverwood's summary judgment motion and its objection that the trial

---

[4] As we have explained, section 9(b) provided that for three years from the date of the Letter Agreement, Riverwood would not "interfere with or otherwise disrupt the business relations between the Company and any of its current or prospective customers or suppliers" "as a result of knowledge or information obtained from the Evaluation Material or in connection with a possible Transaction."

court's "additional consideration of summary judgment, let alone a new motion or new grounds" violated the court's scheduling order. Citing David's testimony that Riverwood began sourcing building supply materials after the Letter Agreement was signed, and arguing "that Riverwood benefitted by contracting to receive compensation from customers to whom it provided that new service, including Wolff Company, Gemco, and Katerra," Global Supply contended it lost the $1,015,197 it paid to develop its proprietary and confidential service to source building materials.

Riverwood responded that its grounds for summary judgment included its no-evidence challenge to Global Supply's claim that "any alleged breach [of the Letter Agreement] caused Plaintiff injury for which the law allows a recovery of damages." Riverwood also pointed to the motion's summary of argument section alleging that "[t]here is no evidence of recoverable damages." We also note that Riverwood's motion for summary judgment alleged that Global Supply has "no evidence that Riverwood has done business with Plaintiff's customers." Consequently, we conclude that the trial court's order for supplemental briefing did not raise new grounds.

In its supplemental response, Riverwood argued that the only Evaluation Material it received from Global Supply was the Power Point slides and "statements by [Odette] that Plaintiff had started a supply chain management service for building materials for Mr. Backes' other company, [PRA]." Riverwood argued:

> Riverwood did not use, access, consult, or distribute the slide deck after merger talks ended. Plaintiff does not argue otherwise. Instead, it argues that it suffered $1,015,197 in damages for "incurred costs to develop its proprietary, confidential business service to source building materials." There is just one glaring, fatal problem for Plaintiff—***Riverwood never received this service***. Plaintiff only told Riverwood that it was sourcing building materials, but never disclosed ***how***. No trade secret, method, process, formula, or other confidential information about that business was ever shared. Therefore, the $1,015,197 that Plaintiff allegedly incurred cannot be recovered from Riverwood.

Riverwood also relied on Global Supply's response to an interrogatory requesting that Global Supply identify the trade secrets, Evaluation Material, and proprietary and confidential information that it disclosed to Riverwood. Global Supply identified the Power Point slides, which did not include discussion of a supply chain management service for building materials, and "multiple verbal conversations" between Keith and Odette or Backes about "the terms of a potential acquisition of [Global Supply], by Riverwood." Global Supply's response conceded, however, that these verbal conversations "generally did not involve the delivery by [Global Supply] of any trade secrets, or proprietary or confidential information, other than that delivered in writing, and produced as identified above," that is, the Power Point slides.

Although the parties' briefs include authority regarding the appropriate measure of damages for breaches of contract, the issue presented is primarily one of causation. Riverwood's summary judgment motion also challenged this element of Global Supply's breach of contract claim. Regardless of the proper measure, Global Supply failed to raise a fact issue on the question whether Riverwood's breaches of section 9(b)—the solicitations to Backes—were the cause of any damage. The summary judgment evidence was undisputed that Backes did not respond to either overture. Riverwood also established that the Evaluation Material did not include any information, detailed or general, about Global Supply's "proprietary, confidential business service to source building materials" other than the service's existence. Consequently, there was no fact issue precluding summary judgment on Global Supply's breach of contract claim.

We conclude that Global Supply did not establish its right to summary judgment on the ground that Riverwood breached section 9(a) or 9(b) of the Letter Agreement by hiring Austin because Global Supply did not establish as a matter of law that Austin was either Global Supply's employee or its supplier. We also conclude that Riverwood established its right to summary judgment on Global Supply's breach of contract claim because Riverwood met its burden to

–20–

establish that its breaches of section 9(b) of the Letter Agreement were not the proximate cause of any injury to Global Supply, and Global Supply did not raise a fact issue precluding summary judgment on its claim. We decide Global Supply's first and second issues against it.

**B.      Expert witnesses** (Issues 3 and 5)

In its third issue, Global Supply contends the trial court erred by striking three witnesses from giving expert testimony. In its fifth issue, Global Supply contends the trial court erred by striking the expert testimony of witness Paul Peck.

On August 31, 2017—the last day provided by the scheduling order—Global Supply designated three expert witnesses: Ken Chaiken, its counsel; Phillip Odette, its president; and Terry Gonzalez, its vice president. These experts were designated to testify about Global Supply's damages and attorney's fees, but Global Supply did not provide reports for any of these experts. On the same date, Global Supply filed a motion to modify the scheduling order, alleging as "good cause" that Austin's deposition was not set to occur until September 12, 2017, and without her testimony, Global Supply "is unable to adequately anticipate the scope and extent of expert witness testimony that may be necessary to further develop evidence in support of Plaintiff's claims." The trial court heard Global Supply's motion on September 18, 2017, and denied it by order dated the following day.

On September 29, 2017, Global Supply designated Paul Peck as an expert on the value of Global Supply's confidential and proprietary information and Austin's and Riverwood's alleged use and disclosure of that information. Global Supply served Peck's report with his designation.

Riverwood and Austin filed a motion to strike Global Supply's expert designations. They argued that although Global Supply filed suit on September 30, 2015, and agreed to a scheduling order setting August 31, 2017 as the deadline for expert designation and reports, Global Supply did not take any depositions or serve any written discovery until after the August 31, 2017 deadline.

After a hearing, the trial court granted the motion to strike in part. The court struck the designations of Chaiken, Odette, and Gonzalez, ruling that they "may not provide expert testimony in this lawsuit." Peck's designation was not stricken because it was accompanied by his report and CV, but Peck was allowed to provide rebuttal expert testimony only "in response to Defendant Lori Austin's counterclaim for declaratory relief. Mr. Peck is **NOT** permitted to offer expert testimony in support of any claim for which Plaintiff seeks affirmative relief."

### 1. Ruling regarding Chaiken, Odette, and Gonzalez

Riverwood's motion to strike the designations of Odette, Gonzalez, and Chaiken was based on Global Supply's failure to furnish reports for each expert in accordance with the parties' agreed scheduling order that was signed by both parties and the trial court and filed in the trial court record. As we have explained, we review the trial court's ruling for abuse of discretion. *Esty*, 298 S.W.3d at 295–96.

Global Supply argues that civil procedure rule 195 governs expert designations and reports. *See* TEX. R. CIV. P. 195.3 (deposition procedures differ depending on whether expert report has been furnished), 195.5 (court may order expert to reduce opinions and other data to tangible form). But here, as the trial court explained at the hearing on the motion to strike, the parties agreed to a requirement that differed from the rules, as the rules expressly permit parties to do. *See* TEX. R. CIV. P. 191.1 (parties may agree to modify discovery procedures; agreements that comply with rule 11 are enforceable). In *Esty*, we concluded that where the scheduling order required parties to "designate experts and provide reports" within a specified time period, the trial court did not abuse its discretion by striking an expert's affidavit that was not tendered timely. *See Esty*, 298 S.W.3d at 295–96. Consequently, the trial court was within its discretion to strike expert designations that were not made in accordance with the parties' rule 11 agreement.

## 2.  Ruling regarding Peck

Global Supply designated Peck as an expert by the deadline for "the party not seeking affirmative relief on an issue" under the agreed scheduling order. Global Supply also served Peck's expert report on that date. In his report, Peck expressed the opinion that Austin disclosed Global Supply's confidential and proprietary information to Riverwood and used the information for Riverwood's benefit. As noted, the trial court initially ruled that Peck could testify as a rebuttal expert in response to Austin's counterclaim for declaratory relief.

Austin then filed a motion to strike Peck's testimony on the ground that Peck "reviewed no data and applied no methodology" to support his opinion that Austin disclosed Global Supply's confidential information and trade secrets to Riverwood. Austin quoted Peck's opinion from his expert report that "since starting her work for [Riverwood], Lori Austin has disclosed to [Riverwood] and used the confidential information that she obtained from [Global Supply] for the benefit of [Riverwood]." Austin also quoted Global Supply's interrogatory response identifying "the Global Supply trade secrets, Proprietary Information, or Evaluation Materials that You contend Lori Austin disclosed to Riverwood":

> Global Supply's "Product Data Management System," including its methods, processes and techniques; Global Supply's customer information (including some confidential client identities, contract specifications and terms, and pricing models); Global Supply's key supplier identities and pricing models; confidential, proprietary data about how to use a systems management software program like Global Supply's "Systainet Software" and "Arena," and their features as customized and used in commerce at multiple client levels; and [Global Supply's] . . . trade secret and/or confidential, proprietary data regarding or reflecting their methods, formulas, patterns, processes and techniques for assisting clients in the building supply chain management process.

Austin argued that Peck's opinion "is simply a speculative belief that it is 'inevitable' that Austin disclosed Plaintiff's confidential information." She cited Peck's deposition testimony that he had not reviewed the pleadings, discovery responses, or documents produced in the litigation before forming his opinion, and had only briefly reviewed Austin's and Odette's deposition

–23–

testimony before his own deposition. Austin also argued that Peck "knows nothing of what Austin did for [Global Supply], or how she did it, after Peck left his position as CEO in March 2012" and "knows nothing of Riverwood's current business, its customers, what Austin has done for Riverwood, or how she has done it." Austin contended that Peck's only personal knowledge of Riverwood's business "comes from his interactions with Riverwood's then-CEO, Ron Keith, three years before Austin ever worked at Riverwood," and that Peck had no knowledge or belief that Austin "has disclosed or used any specific computer file or document from Plaintiff while working for Riverwood." She also quoted Peck's deposition testimony that Austin "inevitably in the course of her work with Riverwood," would disclose

> information that we would consider at [Global Supply] confidential and proprietary in terms of methodologies and approaches and ways to improve the delivery of services in a multi-tenant, multi-choice a la carte offering, in that if you had it— even if it wasn't offered a la carte, you would have this rather extensive knowledge of working in a multi-customer environment that by its very nature includes things you learn that you wouldn't have learned otherwise had you not been privy to the things that were learned at [Global Supply].

Peck testified that his opinion was based on his belief that Austin's disclosure of confidential information to Riverwood was inevitable because "it's impossible for her not to have done so," rather than on any actual knowledge of any particular confidential information Austin took from Global Supply and was using at Riverwood.

Austin argued that Peck's opinions were not based on any data and consequently were unreliable under the rules of evidence and applicable case law. *See* TEX. R. EVID. 702; *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex. 2006) (expert testimony is unreliable if "there is simply too great an analytical gap between the data and the opinion proffered," quoting *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 727 (Tex. 1998)). "The trial court is not required to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Mendez*, 204 S.W.3d at 801 (internal quotations omitted). Austin concluded that Peck's opinion

was unreliable and inadmissible because it was based only on Global Supply's argument that Austin's disclosure of its trade secrets was "inevitable," not on any data, analysis, or evidence.

Global Supply's response to Austin's motion detailed Peck's knowledge of Global Supply's proprietary PDM service based on his work at Global Supply and with Austin from 2010 to 2012. Peck also provided an additional affidavit. But as Austin pointed out in her reply, Peck admitted he did not know "how Riverwood performs its processes," what customers Riverwood serves, what Riverwood's customers have asked Riverwood to do, how Riverwood uses Arena software, or whether Riverwood offered the "a la carte service" that he testified made Global Supply's system "different." Consequently, although Peck was knowledgeable about Global Supply's proprietary information as of 2012, he had no basis for an opinion as to how or if Austin might be using it at Riverwood in 2015. We conclude that it was within the trial court's discretion to grant Austin's motion to strike Global Supply's designation of Peck as an expert witness. *See Mendez*, 204 S.W.3d at 800 (trial court's determination that expert is qualified and testimony is relevant and based on reliable foundation is reviewed for abuse of discretion).

### 3.      Harmless error

In any event, Global Supply argues in its reply brief that any error by the trial court in striking the designations was "ultimately harmless" because Odette and Gonzalez may give "competent lay testimony about injury and damages." Similarly, Global Supply argues that Peck's testimony "that Austin would inevitably disclose Global Supply's trade secrets while working for Riverwood need not qualify as expert testimony under TEX. R. EVID. 702, because it qualifies as lay opinion testimony under TEX. R. EVID. 701." Absent an error that probably caused the rendition of an improper judgment or prevented proper presentation of the case to the court of appeals, we cannot reverse. TEX. R. APP. P. 44.1.

We decide Global Supply's third and fifth issues against it.

## C.      Global Supply's TUTSA claim (Issue 4)

Global Supply pleaded that Riverwood misappropriated trade secrets either learned during the merger talks or acquired through Austin. Riverwood moved for summary judgment on Global Supply's claim for misappropriation of its trade secrets in violation of TUTSA on one no-evidence ground and two traditional grounds. Riverwood contended there was no evidence that Global Supply's "purported trade secrets are trade secrets; that Riverwood misappropriated the alleged trade secrets; that Plaintiff suffered damages (whether framed as unjust enrichment or a reasonable royalty); that Riverwood's alleged misappropriation was willful and malicious; and/or that Plaintiff incurred reasonable attorney's fees as a result." *See* TUTSA § 134A.002(3) (defining "misappropriation"); § 134A.004 (recovery of damages for misappropriation). Riverwood's traditional grounds included its argument that Global Supply's "'inevitable disclosure' argument cannot support a TUTSA claim for damages." In its fourth issue, Global Supply contends the trial court erred by granting Riverwood's no-evidence and traditional motions for summary judgment on Global Supply's TUTSA claim.

Global Supply contends it offered evidence on all elements of its TUTSA claim. It argues (1) it had protectable interests in its building supply sourcing business and in its PDM program, (2) evidence that Austin is doing the same work at Riverwood that she did at Global Supply is sufficient to raise a fact issue on misappropriation, which can be proved by "inevitable disclosure" in Texas, and (3) it was not required to sue each of its former employees who defected to Riverwood in order to preserve its trade secrets. It also alleged that it suffered damages in the amount of $2,149,319 "representing the compensation it paid to those who developed Global Supply's PDM and building supply sourcing businesses that Riverwood misappropriated—a fair estimate of the costs that Riverwood itself would have had to incur if it had developed those businesses on its own."

The undisputed summary judgment evidence showed that Global Supply did not share any information about its building supply sourcing business model with Riverwood. The seven-slide Power Point presentation did not include this information. In its discovery response, Global Supply conceded that Odette's and Backes's discussions with Keith "generally did not involve the delivery by [Global Supply] of any trade secrets, or proprietary or confidential information, other than that delivered in writing." Nonetheless, Global Supply contends that the idea itself—that building supply sourcing could be operated as a standalone business—is the trade secret that was misappropriated by Riverwood. It argues that discussions regarding its proprietary concept for a building supply sourcing business constituted "Evaluation Material" under paragraph 2 of the Letter Agreement. Global Supply explains in its brief:

> As for the building supply sourcing business, Global Supply demonstrated that it had a protectable interest in both the business and its customers, and that both depended on keeping the information secret. As Odette explained, "first-mover status" in the industry was essential. (CR 2960) The business model took extensive effort to develop, but it would be easy to copy, making it essential for Global Supply to get a foothold in the market for building supply sourcing before its model became publicly known.

But Global Supply does not point to any summary judgment evidence that it shared with Riverwood any information about its "business model" that "took extensive effort to develop." Instead, the evidence showed that Riverwood had sourced building supplies some years before it contacted Global Supply about a possible merger. Although Keith testified he did not know before the 2014 merger discussions that Global Supply was sourcing building supplies, he also testified that Riverwood had already undertaken building supply sourcing projects for at least two customers prior to 2014. Global Supply dismisses this evidence as "one-off projects" rather than "a full-fledged building supply sourcing business line," but does not identify proprietary, confidential, or trade secret information it shared with Riverwood to support this distinction. Global Supply also cites Peck's testimony to support its argument that building supply sourcing

"was unlike anything Riverwood was doing at the time," based on a conversation Peck had with Keith, but Peck also conceded the possibility that both Riverwood and other companies could have been providing the services prior to 2014 without his being aware of it.

Riverwood admits, and the uncontroverted evidence shows, that both Keith and David contacted Backes during the Letter Agreement's three-year term about using Riverwood for sourcing building supplies, knowing that Backes or his company PRA was a Global Supply customer. But the evidence is also uncontroverted that Backes did not respond to, and Global Supply did not lose any business from, Backes or PRA.

Consequently, we conclude the trial court did not err in granting summary judgment on Global Supply's claim that Riverwood misappropriated trade secret or other confidential or proprietary information about Global Supply's building supply sourcing business.

We also conclude that Global Supply did not raise a genuine issue of material fact on its claim for misappropriation relating to its PDM program. Although Global Supply argues its claim does not depend on Austin's inevitable disclosure of trade secrets, there is no other evidence raising a fact issue on misappropriation by Riverwood through its employment of Austin. Riverwood offered Austin's testimony that she (1) returned all company property to Global Supply and did not retain any Global Supply documents when she resigned; (2) signed, and has complied with, an agreement with Riverwood prohibiting improper use of her prior employers' information; (3) has never disclosed any Global Supply confidential or proprietary information or trade secrets to Riverwood; and (4) has "only used information 'which is generally known and used by persons with training and experience comparable to my own, which is common knowledge in the industry or otherwise legally in the public domain, or which is otherwise provided or developed by' Riverwood." Austin also testified that she had not disclosed to Riverwood or used at Riverwood the five specific categories of information Global Supply claims as its trade secrets or proprietary

–28–

or confidential information in this case, and further testified that her work at Riverwood has been performed using publicly-available software and other tools supplied by Riverwood's customers. The only evidence to the contrary is Peck's speculative testimony that Austin must have disclosed Global Supply's confidential or proprietary information in order to do her job at Riverwood. Peck conceded that he had no knowledge or information about the work Austin was actually doing at Riverwood or about Riverwood's product data management system. Austin, in contrast, testified about how she performed her job responsibilities at Riverwood without using Global Supply's confidential information.

We also note that neither TUTSA nor common law prohibits the use of general knowledge, skill, and experience a person acquired during employment. *See* TUTSA § 134A.003(a); *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 22 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd). There is no dispute that Austin was valuable to Global Supply for more than her knowledge of PDM; Global Supply explains that she "came to be viewed as Global Supply's 'most critical employee' for PDM operations, both because of her unsurpassed understanding of the product, and her skill as a facilitator and communicator." Only the first of these attributes is implicated by Global Supply's trade secret claims, yet Global Supply initially pleaded for broad injunctive relief that would curtail Austin from maintaining her livelihood and earning a salary commensurate with her skills. An injunction that prohibits lawful activities is overly broad. *See Computek Computer & Ofc. Supplies, Inc. v. Walton*, 156 S.W.3d 217, 223 (Tex. App.—Dallas 2005, no pet.).

We conclude that Global Supply did not raise a genuine issue of material fact on its TUTSA claim. We decide Global Supply's fourth issue against it.

**D**.      **Global Supply's tortious interference claim** (Issue 6)

Global Supply pleaded that Riverwood willfully and intentionally interfered with the Austin Agreement, alleging that Austin "terminated, breached or failed to perform under the Austin Agreement as a result of Defendant Riverwood's interference." Riverwood moved for summary judgment on this cause of action, alleging there was no evidence of willful and intentional interference, proximate cause, or actual damages incurred as a result of the interference. *See Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77–78 (Tex. 2000) (elements of tortious interference with existing contract are existing contract subject to interference, willful and intentional act of interference, that proximately caused plaintiff's injury, and caused actual damages or loss).

Riverwood argued that it did not willfully or intentionally induce Austin to violate her non-disclosure obligation in section 2 of the Austin Agreement. It offered affidavit testimony by Austin, Keith, and David that no such inducement ever occurred. Global Supply responded that "Riverwood interfered with the Austin Agreement when it solicited and hired Austin to grow, manage and develop its competing PDM service, which caused her to violate Section 2 of the Austin Agreement to not disclose Plaintiff's trade secrets." Global Supply relied on "undisputed" facts that:

- Austin possessed Global Supply's PDM service trade secrets because she had spent several years managing, developing, and growing the service;

- Austin agreed to keep Global Supply's PDM trade secrets confidential;

- Austin used and disclosed Global Supply's trade secrets to develop, grow and manage Riverwood's PDM service;

- Riverwood interfered with Austin's confidentiality obligation under the Austin Agreement when it solicited her and hired her to manage, grow, and develop its competing PDM service;

- Because of Austin's "abrupt termination," Global Supply was unable to deliver services it had agreed to perform for its customers or solicit new customers;

–30–

- Odette testified that because of Austin's resignation, Global Supply was unable to deliver large service offerings to its customers and was unable to continue to offer part of its business services to customers; and

- Odette testified to Global Supply's average profit margins for the contracts Global Supply was unable to perform after Austin's departure.

Global Supply, however, did not cite any summary judgment evidence to support its contention that "Austin used and disclosed Global Supply's trade secrets to develop, grow and manage Riverwood's PDM service." Odette admitted in his deposition that he did not know whether Riverwood had any type of product data management system before hiring Austin. He "believed" she has intentionally disclosed Global Supply's confidential information to Riverwood "[b]ecause it's inevitable":

Q. Do you know whether Riverwood uses this same structure for building materials?

A. I do think that they—I think Lori is following the disciplines she learned with us. I don't know if —I'm assuming she's following what we taught her.

Q. Okay. That's your assumption and belief. Do you have any actual evidence one way or the other? . . .

[A.] I have not spent any time looking at what they are doing in product data management with their customers. I don't have access to it. I don't have influence over it. The only thing it is, is impacting us and—and our ability to do the same.

Q. Okay. But to be clear, your belief is based on the fact that that's how Ms. Austin learned to do it while at Global Supply and your assumption is that's how she is doing it at Riverwood. Did I state that accurately?

A. I guess it's inevitable. I believe it's inevitable.

Austin, however, testified to the following (referring to Global Supply as "GSCS"):

14. I understand, per Section 1.4 of the Employee Proprietary Information and Inventions and Non-Solicitation of Employees and Customers Agreement and the terms of my GSCS Consulting Agreement, that I have a continuing obligation not to disclose to Riverwood (or anyone else) any confidential or proprietary information or trade secrets that I learned from GSCS. I have complied with that obligation at all times. I have never disclosed GSCS trade secrets, confidential information, and/or proprietary information to Riverwood. When I resigned from GSCS, I returned all company property to GSCS and did not retain any GSCS documents. Also, consistent with Section 1.4, at all times while employed by

Riverwood, I have only used information "which is generally known and used by persons with training and experience comparable to my own, which is common knowledge in the industry or otherwise legally in the public domain, or which is otherwise provided or developed by" Riverwood.

15. I have never used at Riverwood, or disclosed to Riverwood, any of the following:

- GSCS's "Product Data Management System," including its methods, processes and techniques;

- GSCS's customer information (including confidential client identities, contract specifications and terms, and pricing models);

- GSCS's supplier identities and pricing models;

- GSCS's confidential, proprietary data about how to use a systems management software program like Global Supply's "Systainet Software" and "Arena" and their features as customized and used in commerce at multiple client levels; or

- GSCS's methods, formulas, patterns, processes and techniques for assisting clients in the building supply chain management process.

16. No one currently or formerly employed by Riverwood—including but not limited to Frank McConahey, Tom David, and Ron Keith—has ever asked or encouraged me to use or disclose any of the items specified in Paragraph 16 [sic] above, or any other trade secrets, confidential information and/or proprietary information of GSCS.

17. Despite what GSCS may believe, my work at Riverwood has been performed using customer-supplied tools, including Arena or Autodesk PLM, as needed. Arena is a cloud-based supply chain management software that is owned and developed by Arena Solutions (https://www.arenasolutions.com/products/plm/). Likewise, AutoDesk PLM is a competing software that is owned by AutoDesk (http://www.autodeskfusionlifecycle.com/en/).

18. Arena and AutoDesk PLM are both freely available to anyone who pays a license to use them. GSCS did not develop that software. Riverwood does not change, modify, alter, or customize Arena or AutoDesk PLM in any way. Instead, I use generally known, industry standard best practices that Riverwood had utilized even before my employment there. I know this to be true both through my own work at Riverwood, and because I have worked extensively with Lorrie Deale, an independent contractor that Riverwood utilized to perform PDM consulting services before my employment began.

19. When I first arrived at Riverwood, I reviewed Ms. Deale's prior work in Arena, and saw that she conformed to these best practices. I have never asked her to

implement any GSCS "confidential, proprietary data" about how to use Arena, nor have I done so.

Similarly, Keith and David testified that they had never asked or encouraged Austin to use or disclose to Riverwood any of the trade secrets or confidential or proprietary information identified by Global Supply in its discovery responses as having been misappropriated, and to their knowledge, Austin had never done so. Global Supply did not point to any summary judgment evidence to the contrary. If evidence was developed in the parties' extensive discovery that Austin's work at Riverwood involved use of anything other than "industry standard best practices," including publicly-available software, Global Supply does not direct us to it. Although a former employee may not disclose trade secrets, she "may use the general knowledge, skills, and experience acquired during employment to compete with a former employer." *Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 467 (Tex. App.—Austin 2004, pet. denied). We conclude Riverwood established that no willful and intentional act of interference by Riverwood was a proximate cause of injury or damages to Global Supply, and Global Supply did not raise a genuine issue of material fact precluding summary judgment. *See Prudential Ins. Co. of Am.*, 29 S.W.3d at 77–78. We decide Global Supply's sixth issue against it.

**E.** **Global Supply's "assisting and encouraging" claim** (Issue 7)

In its seventh issue, Global Supply argues that "Riverwood knew Austin would misappropriate Global Supply's trade secrets and intended to help her do it." Citing *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996), Global Supply argues that the trial court erred by granting summary judgment on its claim that Riverwood assisted and encouraged Austin's misappropriation of trade secrets.

In *Juhl*, the court discussed the "concert of action" theory incorporated in section 876(b) of the Restatement (Second) of Torts, which "imposes liability . . . for substantially assisting and encouraging a wrongdoer in a tortious act." *Id.* Setting out the elements for recovery under section

876(b), the court concluded that even if it adopted section 876(b), the plaintiff could not recover under its terms. *Id.* The court explained that "[t]he purpose of the concert of action theory is to deter antisocial or dangerous behavior," noting that "instances where concert of action liability has been imposed have almost always involved conduct posing a high degree of risk to others" such as drag racing or reckless driving. *See id.* at 644–45 (collecting cases).

The court concluded that the defendants' conduct, participating in a protest and allegedly causing injury to a police officer who sustained a back injury carrying them away from the site, "was simply not the type of highly dangerous, deviant, or anti-social group activity which was likely to cause serious injury or death to a person or certain harm to a large number of people." *Id.* at 645; *see also III Forks Real Estate, L.P. v. Cohen*, 228 S.W.3d 810, 816 (Tex. App.—Dallas 2007, no pet.) (misrepresentation of assets in financial statement "is not the type of activity addressed in the concert of action cases noted in *Juhl*"). And following *Juhl*, we concluded in *West Fork Advisors, LLC v. SunGard Consulting Services, LLC*, 437 S.W.3d 917, 921–22 (Tex. App.—Dallas 2014, pet. denied), that none of the allegations in a suit for misappropriation of trade secrets "can be cast as dangerous or deviant or antisocial," so that summary judgment was proper on the plaintiff's claims for aiding and abetting. Similarly here, Riverwood's alleged conduct cannot "be cast as dangerous or deviant or antisocial." *See id.* Summary judgment was proper on Global Supply's claim against Riverwood for assisting and encouraging Austin's alleged misappropriation of trade secrets. We decide Global Supply's seventh issue against it.

## F.  Austin's requests for declaratory relief (Issue 8)

In its eighth issue, Global Supply contends that the trial court erred by declaring that (1) Austin did not breach the Austin Agreement, and (2) Austin's employment at Riverwood did not violate any contract or statute. Global Supply contends that the trial court erred in these rulings for the same reasons it erred in its rulings on Global Supply's claims for (1) tortious interference

with contract, (2) violations of TUTSA, and (3) breach of the Letter Agreement. We have addressed each of these issues in our previous discussion and decided them against Global Supply. For the same reasons, we decide Global Supply's eighth issue against it.

**G.     Austin's request for attorney's fees** (Issue 9)

In its ninth issue, Global Supply argues that the trial court erred by awarding Austin her attorney's fees. The trial court's order granting summary judgment to Austin included the following rulings:

> (7)     Pursuant to Tex. Civ. Prac. & Rem. Code Chapter 37, the Court **DECLARES** that (a) Austin has not breached the Consulting Agreement that she executed with Plaintiff, and (b) Austin's employment by Riverwood does not violate any statute or contract.

> (8)     Pursuant to Tex. Civ. Prac. & Rem. Code § 37.009, the Court **DECLARES** that it is equitable and just that Austin recover from Plaintiff $78,000 for her reasonable and necessary attorney's fees.

We review for abuse of discretion a trial court's award of attorney's fees under civil practice and remedies code Chapter 37, the Uniform Declaratory Judgments Act. *City of Carrollton v. RIHR Inc.*, 308 S.W.3d 444, 454 (Tex. App.—Dallas 2010, pet. denied).

Global Supply argues that it sought only injunctive relief against Austin, and Austin cannot recover attorney's fees for defending against an injunction request. Global Supply also complains that the trial court erred by including Riverwood's fees for defending against Global Supply's breach of contract claim in the award of attorney's fees to Austin.[5] Global Supply argues that "[t]he Declaratory Judgments Act cannot be used to obtain otherwise impermissible and unavailable attorney's fees," citing *MBM Financial Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 669 (Tex. 2009).

---

[5] Global Supply does not present additional argument on this point or include citations to the record other than to the affidavit testimony of Austin's attorney that "the vast majority" of the legal services performed on Austin's counterclaim also applied to Riverwood's defense. Counsel's statement, however, was part of more detailed testimony addressing the "duty to segregate fees incurred for discrete legal services that did not advance Austin's Counterclaim."

Global Supply contends that there was "no legitimate reason" for Austin to pursue declaratory relief "because Global Supply's claims and Riverwood's defenses already placed those same matters at issue," and because Austin "pursue[d] declaratory relief *after* Global Supply dropped[6] its request for an injunction." Global Supply argues that both of Austin's requested declarations duplicated issues that were already before the court, specifically: (1) her request for a declaration that "her employment by Riverwood did not violate any statute or contract" duplicated the issues in Global Supply's breach of contract claim against Riverwood, and (2) her request for a declaration that she had not breached the Austin Agreement "was already encompassed within Global Supply's tortious-interference claim." Consequently, Global Supply argues, it was error to grant Austin's motion for summary judgment and to award her requested attorney's fees.

In *MBM Financial Corp.*, the plaintiff Woodlands Operating Corp. sued for breach of contract, fraud, and declaratory judgment. *MBM Fin. Corp.*, 292 S.W.3d at 663. At trial, Woodlands recovered no damages on its breach of contract and fraud claims. *See id.* at 663–64. Although Woodlands obtained five declarations, the declarations merely duplicated the issues in the fraud and contract claims. *Id.* at 670–71. The court held that "when a claim for declaratory relief is merely tacked onto a standard suit based on a matured breach of contract, allowing fees under Chapter 37 would frustrate the limits Chapter 38 imposes on such fee recoveries." *MBM Fin. Corp.*, 292 S.W.3d at 670. Explaining that "[a]t trial, the Woodlands recovered no damages on its breach of contract claim, so it cannot recover fees under Chapter 38," the court held that "[a]llowing it to recover the same fees under Chapter 37 would frustrate the provisions and limitations of the neighboring chapter in the same Code." *Id.*

But the court rejected MBM's arguments that declaratory relief was improper, concluding that (1) declaratory relief is available under chapter 37 of the civil practice and remedies code in

---

[6] We note that there are no amendments to Global Supply's petition or any dismissals or nonsuits in the appellate record.

contract cases "before or after there has been a breach" and after a contractual relationship has been terminated; (2) declarations of non-liability are not barred in contract cases; and (3) the existence of another available remedy, such as a claim for breach of contract, does not bar the right to maintain an action for declaratory judgment. *Id.* at 667–69; *see also* CIV. PRAC. & REM. §§ 37.001–.011 (Declaratory Judgments Act).

Here, in contrast, Austin did not tack her declaratory judgment action onto a standard breach of contract claim. *Cf. MBM Fin. Corp.*, 292 S.W.3d at 670. She did not allege a claim for breach of contract against Global Supply, nor did Global Supply allege a breach of contract claim against her. As we have discussed, there are two questions common to several of Global Supply's issues on appeal: (1) whether Austin was an employee or a supplier for purposes of Global Supply's claim against Riverwood for breach of the Letter Agreement, and (2) whether Global Supply could rely on the "inevitable disclosure" doctrine as summary judgment proof of its injury and damages on all of its claims against Riverwood. But these common questions do not establish that Austin's request for declaratory judgment "merely duplicated the issues already before the trial court." *Cf. City of Carrollton*, 308 S.W.3d at 455. Austin sought declarations that she had not breached her agreement with Global Supply and that her employment by Riverwood did not violate any statute or contract. To obtain these declarations, Austin was required to establish that she did not use or disclose Global Supply's "Confidential Information" as defined in section 2 of the Austin Agreement, a matter different from whether Riverwood used "Evaluation Material" in violation of the Letter Agreement. It is undisputed that Austin had no involvement with the 2014 merger discussions between Global Supply and Riverwood and in fact was not aware of them until after she gave notice of her resignation in August 2015. We conclude that the trial court did not abuse its discretion by awarding Austin her attorney's fees under civil practice and remedies code section 37.009. We decide Global Supply's ninth issue against it.

## CONCLUSION

We affirm the trial court's judgment.

/Leslie Osborne/
LESLIE OSBORNE
JUSTICE

180188F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

GLOBAL SUPPLY CHAIN SOLUTIONS, LLC, Appellant

No. 05-18-00188-CV     V.

RIVERWOOD SOLUTIONS, INC., AND LORI AUSTIN, Appellees

On Appeal from the 416th Judicial District Court, Collin County, Texas
Trial Court Cause No. 416-04054-2015.
Opinion delivered by Justice Osborne; Justices Schenck and Reichek, participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellees Riverwood Solutions, Inc., and Lori Austin recover their costs of this appeal from appellant Global Supply Chain Solutions, LLC.

Judgment entered this 16th day of August, 2019.